UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

———————————————————————
                                                )
UNITED STATES OF AMERICA            )
                                                )
v.                                              )        CRIMINAL ACTION
                                                )        NO. 04-10100-PBS
PETER CAVALLARO, SR.                  )
                                                )
———————————————————————)

DEFENDANT'S SENTENCING MEMORANDUM
AND MOTION FOR DOWNWARD DEPARTURE

At the July 22, 2004 hearing, the Court announced its intention to depart downward on

the basis of Peter Cavallaro Sr.'s age and physical infirmity and to impose a sentence of home

confinement, a fine at the high end of the applicable range, a special assessment and a period of

supervised release.  Mr. Cavallaro believes that, notwithstanding the substantial additional

materials submitted by counsel for the government and by his own counsel, the Court's proposed

sentence remains the most fair and appropriate one and requests that this Court impose it on

October 13, 2004.

In this Memorandum, Mr. Cavallaro more fully explains the mitigating circumstances

involved in this case that individually and collectively warrant the imposition of a non-

incarceratory sentence, including: (1) Mr. Cavallaro's advanced age and numerous and

debilitating physical infirmities; (2) his diminished mental capacity resulting from several, long-

standing psychiatric and neuropsychological disorders and cognitive limitations which

substantially contributed to his offense conduct; and (3) the aberrant nature of his offense

conduct when viewed in context of his otherwise law abiding life and many good deeds.

Mr. Cavallaro also renews his Blakely objection and explains why the government has

failed to prove tax loss beyond a reasonable doubt.  As a result of the government's violation of

Mr. Cavallaro's constitutional rights, he requests that the Court not apply any enhancement for tax loss and impose a non-incarceratory sentence.

STATEMENT OF FACTS

A.    <u>Mr. Cavallaro's Personal Circumstances</u>

    1.    <u>Age and Physical Condition</u>

Mr. Cavallaro is a 69-year-old man who suffers from numerous debilitating physical infirmities.  He was born the youngest of twelve children into a first-generation Italian-American family living in Watertown, Massachusetts.  As a young boy, Mr. Cavallaro began working on the family's farm to help support his family and himself.  He quit farming at the age of 8 and went to work at a bakery, and by the age of 12 was also working at a produce market for one of his older brothers.  Mr. Cavallaro attended public schools in Watertown, but was a poor student, particularly in subjects that required reading or writing.  <u>See</u> Report of Julia M. Reade, M.D. dated 7/19/04 ("Reade"), contained in Appendix to Defendant's Sentencing Memorandum and Motion for Downward Departure ("App.") 368.  He graduated from Watertown High School despite attending classes infrequently and having a limited ability to read.  App. 364-65, 368-69. He has had no other education.

Mr. Cavallaro has worked extremely hard and long hours essentially his entire life.  In his early 20s, he managed a bakery, unloaded trucks at another brother's produce shop and helped with his uncle's real estate business.  At 23, he married his wife, Elizabeth (nee DiPietro).  <u>See</u> Letter of Elizabeth Cavallaro, App. 10.  They have three children – Peter Jr., now 43 years old, Patricia (Cavallaro) Richards, who was adopted shortly after birth, now 37 years old, and Pamela (Cavallaro) Heintz, now 36 years old.  Throughout his adult life, Mr. Cavallaro has worked tirelessly to provide for his wife, children and others.  <u>See</u> Letters of Elizabeth Cavallaro, App.

2

10 (He "wants to provide an entire world for his children to keep them safe. It hasn't been easy.

Peter worked tireless hours every holiday, arriving late and tired in order to support his family");

Peter Cavallaro, Jr., App. 12 ("My father has to be one of the hardest working people anywhere.

Year in and year out he has done whatever it took, including many 20 hours days."); Pamela A.

Heintz, App. 25 ("My father was an excellent provider.  He worked literally day and night.").

Mr. Cavallaro has been employed primarily as a wholesale florist, first for a wholesale

florist and produce company operated by his brother, then subsequently on his own.  The work

was physically exhausting – manual lifting, unloading and loading crates, packing and unpacking

produce – and the hours were very long – he arrived to work around 4 am to prepare the daily

produce and often worked until the late afternoon or early evening.  See Letters of Pam Heintz,

App. 25; Joseph and Aurora Spatola, App. 44.  Through sheer hard work and dedication over

many years, Mr. Cavallaro became financially successful – success enhanced significantly by his

frequent and fortuitous investment in real estate since he was a teenager.

Decades of backbreaking work have taken a heavy toll on Mr. Cavallaro's health.  As

reflected in the Presentence Report ("PSR"), ¶¶ 65-75, Mr. Cavallaro's lengthy medical records

(App. 59-340), and reports from his physicians (id. at 363-413, 457-61), his ailments include

cardiovascular disease, hypertension, high cholesterol and heart palpitations and irregular

heartbeats, which have caused Mr. Cavallaro frequent episodes of chest pain, fatigue, dizziness

and shortness of breath and for which he has been hospitalized.  App. at 133-36; 226; 304-17.

Mr. Cavallaro regularly sees his primary-care physician, Stephen P. Ranere, M.D., who has

prescribed various medications for treatment of those conditions.   See PSR, ¶ 66.  Mr. Cavallaro

also has been diagnosed with diverticulitis, which causes inflammation of the small intestine and

colon and gastrointestinal bleeding, for which he also has been hospitalized.  (App.153-59; 174;

184-202; 247-91)  Within the past several years, Mr. Cavallaro has developed diabetes, which requires daily monitoring of blood sugar through at home testing, additional medication and a special diet.  See PSR, ¶ 66; App. 160-63; 165.  Mr. Cavallaro also suffers from prostratic hypertrophy and renal cysts.  Id.; App. 150.  He has undergone surgery to repair ruptured disks in his back and suffers from chronic arthritis in his back, knee, shoulder, left foot and other joints, for which he has regularly sought medical treatment over the past several years.  See PSR, ¶¶ 66, 68; App. 139-43; 294-95.

Additionally, Mr. Cavallaro suffers from obstructive sleep apnea, a condition that causes him to repeatedly stop breathing during sleep and requires monitoring and treatment.  See PSR, ¶ 67; App. 333-40.  To control this condition, Mr. Cavallaro sleeps with a facial mask continuous positive airway pressure (CPAP) respiratory machine (PSR, ¶ 67), which is expensive, has fragile parts and needs regular calibration and cleaning.

Mr. Cavallaro's ailments also require him to take a number of medications:  Lipitor for high cholesterol; Lisinopri, Verapamil and Triamterene for hypertension; Metformin for diabetes; and Terazosin for prostratic hypertrophy.  See PSR, ¶ 66; Reade, App. 371.

    2.    Mental Health

        a.    Psychiatric History and Diagnosis

Mr. Cavallaro also suffers from several psychiatric disorders: (1) Major Depressive Disorder; (2) Panic Disorder; and (3) Avoidant Personality Disorder, which are described as follows:

    (1)    Major Depressive Disorder is a mood disorder that is categorized as a major
        mental illness and characterized by prolonged episodes of depressed mood,
        accompanied by disrupted sleep, low energy, decreased concentration, poor
        appetite, diminished interest in previously pleasurable activities, guilty
        ruminations and, frequently, suicidal ideation.

 (2) Panic Disorder is a disabling form of anxiety which results in episodes of extreme anxiety, accompanied by feelings of impending doom – frequently the conviction of imminent death – and a host of physical symptoms: chest pain, chest tightness, lightheadedness, blurry vision, stomach upset, sweating, numbness and tingling, etc.

 (3) Avoidant Personality Disorder is a constellation of maladaptive personality traits which are manifested in a person's feelings, thoughts and actions. They represent longstanding and deeply rooted aspects of personality, and are frequently out of the individual's conscious awareness. Individuals with Avoidant Personality Disorder avoid social situations and close relationships with others because they expect to be rejected, criticized, ridiculed or shamed.

See Reade, App. 380.

 "Mr. Cavallaro has suffered from recurrent bout of depression and panic throughout much of his adult life." Reade, App. 380. He initially sought treatment for those conditions in the mid-1980s, when a business dispute over the flower company that Mr. Cavallaro's brother founded and owned, and where Mr. Cavallaro worked for many years, erupted into an intra-family battle causing Mr. Cavallaro to become acutely depressed and withdrawn. Over several months, Mr. Cavallaro experienced difficulty concentrating, working or sleeping and eventually he broke down completely, unable to leave his own bedroom. He told his wife that he was unable to think, felt his legs would not hold him up and that he was contemplating suicide. Elizabeth Cavallaro persuaded him to see a psychiatrist, Dr. Sturtevant, who prescribed a sedating medicine. While Mr. Cavallaro felt well enough to return to work after a couple of months, Mrs. Cavallaro believes her husband never fully recovered from this breakdown. Reade, App. 372, 374.

 By 1987, Mr. Cavallaro had stopped seeing Dr. Sturtevant and stopped taking his medication. He again fell into depression because of pressure at work, deaths of his siblings and the illness of a salesman, which caused Mr. Cavallaro to become "panic-stricken about his own well being." Reade, App. 373. Doctors' assurance about his health did not relieve his panic. In

April 1987, Mr. Cavallaro saw Dr. Arnold Kerzner, a psychiatrist who has been treating Mr. Cavallaro ever since.  Dr. Kerzner prescribed Imipramine (Tofranil), a sedating antidepressant with anti-panic properties.  By August of 1987, Mr. Cavallaro's condition had recovered to 75% of his baseline condition.  Id.

Mr. Cavallaro sought treatment from Dr. Kerzner again in November, 1988, by which time he had stopped taking his medication and his anxiety returned when he experienced stresses at work and at home with his daughter, Patti, who rebelled against her parents during her teenage years and for a lengthy period of time thereafter.  See Letter of Patti Richards, App. 40-41; Reade, App. 373.  Dr. Kerzner treated Mr. Cavallaro's depression and anxiety with increased dosages of Imipramine.  Reade, App. 373

Throughout the 1990s, this pattern continually repeated itself:  Mr. Cavallaro would not take his medication as prescribed and would stop seeing Dr. Kerzner; stress at work and/or home or about Mr. Cavallaro's physical well-being caused him to become anxious, nervous, depressed and panicked; he would stop thinking clearly; and eventually, his functioning deteriorated to the point where he sought Dr. Kerzner's assistance for treatment.  According to records maintained by Dr. Kerzner, Mr. Cavallaro sought treatment from him on 7/10/89, 10/16/89, 10/30/89, 2/19/92, 1/26/93, 5/28/93, 12/2/93, 6/1/94, 6/16/95, 8/15/97, 5/18/98, 8/4/00, 10/31/00, 8/31/01, 11/20/02 and 12/10/03.  See Kerzner records, App. 60-96.  Dr. Kerzner repeatedly increased the dosage of Imipramine, but failed to take other steps to more effectively treat Mr. Cavallaro such as switching to newer, more effective anti-depressants that became available during the 1990s or developing more comprehensive therapeutic plans involving regularly scheduled follow-up sessions or alternative treatments such as relaxation techniques or cognitive behavioral therapy. See Reade, App. 374, 380-81.  By continuing to prescribe an outdated drug that clearly was not

6

fully treating his symptoms, Dr. Reade believes Mr. Cavallaro received suboptimal psychiatric care.  Id., 380-81.

            b.      <u>Neuropsychological History and Diagnosis</u>

In addition to those psychiatric disorders, Mr. Cavallaro has a long history of cognitive deficiencies, including difficulties at school and problems reading and writing.  Based on a complete battery of neuropsychological tests, William Stone, Ph.D., a licensed neuropsychologist, concluded that, despite a "low average" overall cognitive ability, Mr. Cavallaro has "significant" cognitive and personality weaknesses that "influence[d] areas of [his] function in a negative manner."  <u>See</u> Report of William S. Stone, Ph.D. ("Stone"), App. 392, 395.  The most adversely affected areas were Mr. Cavallaro's:

- processing [of] complex verbal information;

- initial acquisition of new information;

- fatigue following a sustained mental effort;

- mental flexibility in complex verbal situations; and

- visual problem solving, which put Mr. Cavallaro "at a disadvantage when he is faced with novel, complex challenges that require him to see the 'big picture' before taking detailed steps."

<u>See</u> Stone, App. 394-95.

Moreover, those cognitive deficiencies, in Dr. Stone's opinion, contributed to, and were compounded by, Mr. Cavallaro's depression, panic and avoidant personality disorders:

> To at least some extent, Mr. Cavallaro's weaknesses in overall cognitive abilities, reading, complex verbal manipulations, sustaining an intellectual effort and in organizing complex tasks, contribute to [his] avoidance.  In this evaluation, the more complex the verbal task, the more Mr. Cavallaro's performance suffered. Moreover, his cognitive weaknesses occurred in the context of an Avoidant Personality Disorder, which reflects a scenario in which Mr. Cavallaro habitually avoids tasks that he feels he cannot

> perform without engendering disapproval or embarrassment. His
> vulnerability to anxiety and depression exacerbates his
> maladaptive responses – it likely makes him even more avoidant –
> and focuses him in inefficient directions (e.g., his physical health)
> rather than on problems that need to be addressed.

Stone, App. 395.

B.    Circumstances of the Offense

1.    Government's Description

The Indictment charged Mr. Cavallaro with committing complex tax offenses. It alleged that he willfully filed false income tax returns for 1997 and 1998 that did not fully reflect all of his income. The most significant source of unreported income were payments that customers of Mr. Cavallaro's wholly-owned flower company, Albany Street Wholesale Florist, Inc. ("Albany Street" or "the company"), made to Mr. Cavallaro that the government maintained should have been made to the company. See Indictment ("Ind."), ¶¶ 7-8. In addition, the Indictment alleged that Mr. Cavallaro failed to report $22,627 of interest income on two personal loans he made in 1996 and 1997 (Ind., ¶¶ 9-11) and $43,000 as capital gains on an option to purchase real estate in North Reading, MA (Ind., ¶¶ 12-13). Although not alleged in the Indictment, the government claims that Mr. Cavallaro underpaid his taxes by $36,087 in 1997 and $137,444 in 1998, or by a total of $173,531. See PSR, ¶¶ 23-24.

2.    Mitigating Circumstances

Although Mr. Cavallaro signed his tax returns, he did so without reading or reviewing them. They were prepared not by Mr. Cavallaro, but by a "registered agent," Richard Bartley, who, along with his wife, provided tax preparation services out of their home in Watertown, MA. Mr. Bartley had an informal and haphazard way of preparing Mr. Cavallaro's individual and corporate tax returns; he did so based exclusively on his review of Mr. Cavallaro's bank records,

treating any deposits into the corporate account as a gross receipt and relying on cancelled checks or check stubs to track expenses. Mr. Cavallaro dropped off or had delivered the records to Mr. Bartley's house in plastic trash bags at the end of a tax quarter or tax year. Mr. Bartley did not interview or question Mr. Cavallaro in connection with his preparation of the returns. Mr. Cavallaro filed whatever Mr. Bartley returned to him and paid whatever tax he said to pay. See Reade, App. 365 (Cavallaro: "When the accountant gives me the papers, I sign. I don't read it all. I'm not going to sit and read it – it would take me 12 years. I'm going to depend on them.").

While the government would argue that Mr. Cavallaro manipulated his tax preparer's lax policies and procedures, that claim is belied by numerous instances where Mr. Bartley made errors that resulted in Mr. Cavallaro *overpaying* his taxes. Some of the errors on returns prepared by Mr. Bartley, as confirmed by Craig Shuffain, a certified public accountant retained by Mr. Cavallaro's counsel to review his tax filings, include:

1.    $190,000 of unclaimed losses resulting from a failed investment in show horses that Mr. Cavallaro could have taken as a deduction on his 1998 personal income tax return. See Affidavit of Craig Shuffain ("Shuffain Aff."), App. 415, ¶ 5(a).

2.    $50,000 in unclaimed charitable contributions to a church that Mr. Cavallaro could have taken as a deduction on his 1998 personal income tax return. Id., ¶ 5(b).

3.    $212,327.69 of unclaimed legal expenses and losses incidental to Mr. Cavallaro's acquisition of real estate that could have been taken as a depreciation deduction by one of Mr. Cavallaro's companies. Id., ¶ 7.

If Mr. Cavallaro had taken the first two deductions, his tax debt on his personal returns for 1997 and 1998 would have been over $60,000 less than the amount now claimed by the government. Id., ¶ 8. The third deduction would have reduced Mr. Cavallaro's corporate tax over a 39 year period. Id., ¶ 7. Additionally, Mr. Cavallaro loaned significant sums of money to Albany Street

in the early-to-mid 1990s. Records also establish that Mr. Bartley mistreated at least $204,000 by mistakenly treating those funds as taxable income to the company, rather than not non-taxable officer loans. Id., ¶¶ 9, 11. Correct treatment of those loans would have further reduced the tax loss to the IRS by at least another $30,000. Id., ¶ 10.

It is also important to point out that Mr. Cavallaro believed he was entitled to receive the payments the Indictment charges as "diverted business receipts" as repayment of his prior loans to the company. Mr. Cavallaro does not dispute that he failed to advise his tax preparer what he had done with those receipts. However, if he had done so and if Mr. Bartley had properly recorded the officer loans and repayments, Albany Street could have, in Mr. Shuffain's opinion, "reported all of the 'diverted' income and paid little tax" and Mr. Cavallaro could have properly taken the "diverted business receipts" as repayment of his loans to Albany Street without any income tax effect. Shuffain Aff., App. 416, ¶¶ 10, 11.

Finally, with respect to the unreported interest income charged in the Indictment, it should be noted that the borrowers did not send Mr. Cavallaro 1099 tax forms with respect to the transactions. See Affidavits of Walter T. Arsenault, App. 463, ¶¶ 2-5 and Dr. James Manganello, App. 462, ¶¶ 4-6. While he did receive repayments of those funds, it was difficult – particularly with the informal system utilized to prepare his returns – to determine what portion of the payments were repayments of the loan principal and what was interest income. Similarly, the tax ramifications arising from transactions on the North Reading real estate – which Mr. Cavallaro obtained through a complicated foreclosure and received additional revenue on through a purchase option that eventually expired – were anything but simple or straightforward.

C.    Mr. Cavallaro's Community and Family

Apart from conduct involved here, Mr. Cavallaro has led a truly exemplary life, a point richly illustrated by the many people who have written to this Court on his behalf.  See App. 1-58.  This outpouring of support is a testament to the true nature of the man before this Court – a man to whom little was handed, but by dogged determination and tireless work has overcome sizable obstacles to become a wonderful husband, father and grandfather, an employer and provider of many, and someone always looking extend a helping hand, particularly to those who have the least.

For example, since the 1970s, Mr. Cavallaro has actively supported prison work release programs by regularly hiring and employing recently released convicts, most of whom suffer from serious addictions to drugs or alcohol and cannot find work elsewhere.  Lois Rubin, a senior counselor at one program, writes:

> Peter Cavallaro has hired many of our clients.  He knows that they are in a program and usually have extensive CORI's.  It is very difficult for our clients to obtain full time employment.  …
>
> I have known Peter since 1999.  Many times I have called to ask him if he could help our clients.  He has never refused any request I have asked of him.  In addition, Peter calls our program to ensure clients will not miss group or program participation. …

Letter of Lois Rubin, App. 42; see letters of Rev. Dr. Samuel S. Bombara, App.1; John Burke, App. 4-5; Rev. Rodney B. Hart, App. 28; Michael A. Sullivan, App. 48 (noting Mr. Cavallaro's employment of persons residing at Pine Street Inn).

Individuals who have directly benefited from Mr. Cavallaro's participation in those programs express gratitude to him not just for the job, but also for helping them in numerous other ways, including paying for food and housing (for a year and a half for one individual), encouraging them to stick with rehab programs, counseling them about the importance of maintaining contact with their children and treating them with dignity and respect.  See Letters of

Paul Camarro, App. 8-9; Thomas Greene, App. 23-24 (noting that Mr. Cavallaro has similarly

helped at least four other individuals he knows); Rubin, App. 42-43.  Ms. Rubin confirms that

Mr. Cavallaro:

> is a man who has helped many people.  …  Peter understands
> them.  He knows how to motivate them and remind them that they
> are not bad people, and that being in treatment is their way out of a
> life of drugs and gangs.

Rubin letter, App. 42-43.  Because of Mr. Cavallaro, Mr. Camarro feels like he has "a chance at

something good in [his] life" again.  App. 9.  Mr. Greene states, even more starkly, Mr.

Cavallaro "kept me alive."  App. 24.

Mr. Cavallaro has actively supported other charities as well.  That support has included

significant financial contributions to numerous churches, making substantial contributions of

cash (over $50,000 one year), purchasing stained glass windows (see letter of William G.

Clawson, App. 15) and supporting missions to Romania, Guatemala and elsewhere (see letters of

Bombara, App. 1, Rev. David D. & Kathleen C. Walker, App. 51; Steven J. Samuel, App. 43A).

He has also given of his own time and efforts, among other things, attending a mission to Haiti,

(Walker letter, App. 51), serving on the church's building committee (Bombara letter, App. 1)

counseling another church on real estate (Manganello letter, App. 33) and financing (letters of

George J. DeTellis, App. 18, and Manganello, App. 33).  Mr. Cavallaro has also supported sports

programs for inner-city youth in Boston.  See Letter of Peter F. Mugford, Sr., App. 35.

Mr. Cavallaro has frequently given away flowers, plants and other products.  According

to Cambridge Mayor Michael A. Sullivan, "Mr. Cavallaro was famous for distributing his

overstock plants to patients recuperating at area hospitals."  App. 48.  See also Letter of John M.

McCormick, App. 34 (Mr. Cavallaro supplied flowers to the Jimmy Fund for distribution to

patients at Children's Hospital).  He has also donated Christmas trees for school fundraisers (see

letter of Steve Heintz, App. 27) and regularly provided free flowers and plants to numerous

churches and church groups.  <u>See</u> Letters of Dr. N. Benjamin Crandall, App. 16 ("Always at

Christmas, Easter, Graduation and for all major banquets and functions at the school, Peter

Cavallaro furnished all the extensive floral decorations.  He supplied as well the many hundreds

of plants and flowers that were planted yearly outside on the grounds of the school"); Rev.

Douglas B. Crandall, App. 17 ("Peter has been very generous to our congregation with his giving

of many plants and flowers seasonally every year, this has added a great joy to our people.  Peter

has never asked for payment of any kind or a favor in return."); DeTellis, App. 18 (noting Mr.

Cavallaro frequently gave flowers to churches in Massachusetts and Rhode Island); John Peck,

App. 36 (Mr. Cavallaro provides free flowers to Faith Alliance); Elder Daniel L. Reason, App.

38 (Mr. Cavallaro gives flowers to St. Paul's Church in Lexington); Rev. Nicolas S. Zaccardi,

App. 55 (Mr. Cavallaro has donated flowers to the First Baptist Church in Watertown every

Christmas and Easter for the past seven years).

      On top of all that, Mr. Cavallaro has been an extraordinarily devoted and supportive

husband, father, grandfather, son-in-law and brother.  Among other things, Mr. Cavallaro has

raised an adopted daughter, Patti, who struggled to adjust throughout her teens and 20s, as she

explains:

> I was the kind of child that had to learn all my life lessons on my
> own.  The benefit of my father's wisdom fell on deaf ears.  He
> tried so many times to talk to me about what I was doing.  He was
> trying to guide me and teach me.  I skipped school.  I stayed out
> late.  Sometimes I would lie to my parents about where I was
> going.  My father spent many nights driving around our town
> looking for me.  Even into my young adulthood I was still
> foundering.  I was married at a young age and separated very
> quickly.  My father was there to help me through.  … I know it
> hurt him to see me struggling in [a] lifestyle that wasn't healthy,
> but he never gave up hope for me.  I know that I have caused him
> much pain, stress and anxiety during those years. …

> Without my father it is hard to say where I would have ended up.
> He has been there to help me throughout my life.  You may think
> that this is a parent's job anyway, but you didn't have me as a
> daughter.

See Patti Richards letter, App. 40-41.  While doing a great job raising his own children, Mr.

Cavallaro has also taken in and supported his parents in-law, who have lived with him (free of

charge) for over a decade and continue to reside with him today.  His 84-year-old mother-in-law

explains what this has meant to her:

> It would be difficult to express the gratitude I feel for the
> opportunity that he has given me by opening his home to me.  It is
> difficult to say how important it is to feel secure at our age.  I want
> you to understand the extent of this gesture.  He takes care of us.
> When he is out doing his own grocery shopping he always brings
> groceries home for us.  He checks in on us to make sure that we're
> alright.  He pays all the bills in the house so that we don't have to
> worry about it.

See Anna DiPietro letter, App. 19.

## ARGUMENT

A.    Because of Several Mitigating Circumstances that Take This Case Outside the Heartland
of Typical Tax Cases, This Court Should Downwardly Depart to Impose a Non-
Incarceratory Sentence.

Because Mr. Cavallaro's offense conduct ended in April of 1999, this Court is not limited

by any of the subsequent restrictions Congress or the Sentencing Commission put on this Court's

ability to depart downward.  United States v. Mehta, 307 F. Supp.2d 270, 273 n.12 (D. Mass.

2004).  This case is instead governed by the more flexible standards the Supreme Court outlined

in United States v. Koon, 518 U.S. 81 (1996), where it explained "the Guidelines . . . place

essentially no limit on the number of potential factors that may warrant departure."  Id. at 106

(internal quotation marks and citations omitted).  As long as the Commission has not "proscribed

consideration of a factor as a categorical matter," a sentencing court may depart on the basis of

that factor if it, alone or in combination with other such factors, "takes the case outside the heartland of the typical Guideline." Id. at 108, 112. See also U.S.S.G. § 5K2.0, p.s. (1999 ed.).

      1.     <u>Mr. Cavallaro's Age and Infirmity Warrant a More Lenient Sentence.</u>

The Sentencing Guidelines authorize this Court to depart downward on the basis of Mr. Cavallaro's age and physical infirmity under U.S.S.G. §§ 5H1.1 and 5H1.4. Section 5H1.1 states that age is ordinarily not relevant in determining whether a sentence should be outside the guidelines. U.S.S.G. § 5H1.1. However, "[a]ge may be a reason to go below the guidelines when the offender is elderly and infirm and where a form of punishment such as home confinement might be equally efficient and less costly than incarceration." Id. Similarly, section 5H1.4 indicates that a defendant's physical condition is not ordinarily relevant in determining whether a sentence should be outside the guidelines. U.S.S.G. § 5H1.4. "However, an extraordinary physical impairment may be a reason to impose a sentence other than imprisonment; e.g., in the case of a seriously infirm defendant, home detention may be as efficient as, and less costly than, imprisonment." Id.

The Sentencing Guidelines do not define "elderly" or "infirm" or explain when home confinement would be "equally efficient and less costly than incarceration." Courts analyzing departures under these sections have first considered whether the defendant is elderly *and* infirm and, if so, whether home confinement would be equally efficient and less costly than incarceration. See United States v. Carey, 895 F.2d 318, 324 (7th Cir. 1990) ("To base a departure on § 5H1.1, the court must make a finding that [defendant] was elderly and infirm and that an alternative form of confinement would be equally efficient and less costly than incarceration."); United States v. Willis, 322 F. Supp.2d 76, 84 (D. Mass. 2004) ("The defendant must first be in the range of physical impairments and/or age which could trigger a departure.

Then the court is to balance the costs of home detention vs. incarceration."); United States v.

Baron, 914 F. Supp. 660, 662 (D. Mass. 1995) (considering defendant's age, physical conditions

and efficacy of home detention for departure under §§ 5H1.1 and 5H1.4).

       a.     Mr. Cavallaro is Elderly and Infirm.

Mr. Cavallaro turns 70 in February. While "there is no particular age that qualifies for

'elderly'" within the meaning of section 5H1.1, Willis, 322 F. Supp.2d at 83 n.11, as this Court

recognized at the July 22 hearing, courts have concluded that defendants around Mr. Cavallaro's

age (and some even younger) were eligible for departures under section 5H1.1. See, e.g., United

States v. Whitmore, 35 Fed. Appx. 307, 321-22 (9th Cir. 2002) (departure for 67-year-old

defendant); Willis, 322 F. Supp.2d at 76 (departure for 69-year-old defendant); United States v.

Kloda, 133 F. Supp.2d 345, 349 (S.D.N.Y. 2001) (departure for 63-year-old defendant); Baron,

914 F. Supp. at 662-65 (departure for 76-year-old defendant); United States v. Frank Maltese,

No. 90 CR 87-19, 1993 WL 222350 (N.D. Ill. June 22, 1993) (departure for 62-year-old

defendant).[1]

Given his advanced age and lifetime of hard work, it is not surprising that Mr. Cavallaro

suffers from numerous physical and mental infirmities, which include: (1) cardiovascular

disease; (2) hypertension; (3) high cholesterol; (4) diverticulitis; (5) diabetes; (6) sleep apnea; (7)

prostratic hypertrophy; (8) renal cysts; (9) ruptured disks in his back; (10) arthritic pain in his

---

[1] Sentencing courts in this District have granted section 5H1.1 departures in cases involving defendants in their 60s in several non-published decisions. E.g., United States v. Gordon J. Rollert, No. 1:01-cr-10031-RWZ, unpub. disp., App. 464-77 (D. Mass. Dec. 10, 2001) (departure for 67-year-old defendant under §§ 5H1.1 and 5H1.4); United States v. George A. Moran, No. 1:90-cr-10202-ADM, unpub. disp., App. 478 (D. Mass. 1991) (departure for 68-year-old defendant). As this Court noted on July 22, there is at least one reported decision where a defendant in his 80s was not given departures under section 5H1.1. United States v. Brooke, 308 F.3d 17 (D.C. Cir. 2002). However, there was "no question" the 82-year-old defendant was "elderly" within the meaning of that section. Id. at 20. Instead, the defendant was denied a departure because home confinement was not "equally efficient" as incarceration where defendant had history of drug dealing from home. Id. at 20-21.

knees, shoulder, feet and other joints; (11) Major Depressive Disorder; (12) Panic Disorder; and

(13) Avoidant Personality Disorder.  See *supra* at 2-8 (describing ailments in more detail).  As

reflected by Mr. Cavallaro's well-documented, twenty-plus years of medical and psychiatric

treatments (App. 59-340) and as confirmed by the Probation Office, Mr. Cavallaro receives

regular and ongoing medical and psychiatric care for those conditions.  He takes six prescribed

medications on a daily basis, tests his glucose levels several times a day and sleeps with a facial

mask to help control his sleep apnea, hypertension and cardiovascular disease regularly.  See

*supra* at 3-4.  See also 342 Paul E. Peppard, Ph.D. *et al.*, "Prospective Study of the Association

Between Sleep-Disordered Breathing and Hypertension," The New England Journal of Medicine

1378-84 (May 11, 2000) (App. 341-55) (sleep apnea likely risk factor for hypertension and the

consequent cardiovascular morbidity in general population); 163 Eyal Shahar, *et al.*, "Sleep-

disordered Breathing and Cardiovascular Disease," Am. J. Respir. Crit. Care Med. 19-23 (2001)

(App. 356-61) (sleep apnea associated with acute effects on cardiovascular disease).  All of those

treatments and care require close and frequent monitoring by physicians of their dosages, effects

and interactions, as explained by Dr. Kerzner:

> Monitoring and treatment of such numerous medical and
> psychiatric conditions in a person of his advanced age (70 in
> February 2005) is a challenge under the best of conditions. To
> maintain stability of daily function, [Mr. Cavallaro] needs support
> he has developed from his physicians and at home for his several
> daily blood sugar tests, nightly use of a Continuous Positive
> Airway System (to prevent sleep apnea impact on cardiovascular
> function), medication and other daily regimen necessary to his
> care.

Report of Arnold Kerzner, M.D., App. 458.

Incarceration will exacerbate Mr. Cavallaro's physical and psychiatric ailments. While the Bureau of Prisons will provide some of the necessary medical and psychiatric care,[2] the availability of that care will be limited and may result in Mr. Cavallaro not receiving appropriate medications, cause extreme distress, worsen his medical and psychiatric conditions and "put him at increased risk for developing suicidal ideation." See Reade, App. 384. Dr. Reade opines:

> Incarceration is likely, in my opinion, to cause Mr. Cavallaro extreme distress, and could result in exacerbation of his medical and psychiatric conditions. Given his cognitive rigidity, his history of mental illness, his baseline levels of anxiety and depression, and his vulnerability to panic, he is likely to adapt poorly to incarceration. Specifically, Mr. Cavallaro is likely to experience an increase in his anxiety symptoms, more frequent panic attacks, multiple physical symptoms, and worsening depression. His already elevated levels of shame and self-recrimination put him at increased risk for developing suicidal ideation.

See Reade, App. 384-85. Dr. Kerzner shares those concerns:

> Removing Mr. Cavallaro from access to his treating physicians and his home support would not be advisable. I am convinced that if Mr. Cavallaro is incarcerated, it would at the very least seriously

---

[2] On October 4, 2004, the government faxed defense counsel a letter dated September 30, 2004 from Barbara J. Cadogan, a BOP administrator, in which she opines, based on her review of Mr. Cavallaro's medical records, that BOP would be able to provide appropriate care for him. First, courts have discounted such assurances because BOP provides them in every case. See Willis, 322 F. Supp.2d at 85 ("I have never had a case before me in which the Bureau of Prisons suggested that it did not have the capacity to care for a defendant."). Second, while Ms. Cadogan cites statistics for inmates suffering from many of the individual conditions from which Mr. Cavallaro suffers, she does not mention even a single inmate who suffers from all of those conditions in combination. Third, even if BOP were able to provide care for such an individual, that means little to this Court's analysis under sections 5H1.1 or 5H1.4. "It cannot be that if the BOP can accommodate a given medical condition, it is by definition not extraordinary. If that was so, there would be no need for the second sentence, balancing cost of home detention and incarceration. Nor would there be any need for the modifier, 'adequately.'" Id. See also United States v. Crumbliss, 58 Fed. Appx. 577, 580-81 (4th Cir. 2003) (rejecting government argument that defendant's medical conditions were not extraordinary because BOP could provide medical care for them). Moreover, this Court is not required to find that Mr. Cavallaro's physical conditions are "extraordinary" to depart under section 5H1.1; only that those conditions render him "infirm." U.S.S.G. § 5H1.1; see Brooke, 308 F.3d at 20-21 & n.3 (noting sentencing court's findings that defendant's disabilities were not "extraordinary" did not preclude departure under section 5H1.1); Whitmore, 35 Fed. Appx. at 321-22 (affirming section 5H1.1 departure despite sentencing court's conclusion that defendant's physical disabilities were not "extraordinary").

> jeopardize his health and could lead to life threatening
> deterioration in his current ailments.

See Kerzner, App. 457-58.

Mr. Cavallaro's infirmities are at least as bad as, if not worse than, those of defendants where courts have departed under sections 5H1.1 or 5H1.4. For example, Mr. Cavallaro's physical conditions are significantly worse than the defendant's condition in Brooke, where a court of appeals approved of the district court's finding that Mr. Brooke was "infirm" within the meaning of section 5H1.1 where he suffered from a swollen knee, arthritis, respiratory problems and chest pain. 308 F.3d at 20-21. Similarly, in Willis, a recent tax prosecution in this district involving another 69-year-old defendant who had failed to pay twice as much in tax as the government claims is involved in this case (proceeds from an allegedly illegal gambling enterprise), Judge Gertner downwardly departed from an offense level 17 (four levels higher than the one in this case) to probation with six months in home confinement. 322 F. Supp.2d at 76-79, 85. Like Mr. Cavallaro, the defendant suffered from multiple, serious and deteriorating physical conditions, including many of the very same ailments involved here, including hypertension, high cholesterol, joint disease, gastrointestinal disease, chest and back pain. Id. at 79-80. Although none of the defendant's individual conditions was immediately life threatening and could be treated by BOP, Judge Gertner still ruled that because of the defendant's "inordinate number of potentially serious medical conditions" and because he had reached "an age where these medical conditions will invariably get worse," the defendant fell within "the zone that enables [the court] to balance the cost of home detention vs. jail" under sections 5H1.1 or 5H1.4. Id. at 84-85.[3]

---

[3] See also Crumbliss, 58 Fed. Appx. at 581 (affirming downward departure under § 5H1.4 for defendant with diabetes who had had two toes amputated and weakness and pain in his legs and hips); Rollert, App. 464-76 (downwardly departing based on defendant's age and physical condition where 67-year-old

     b.    <u>Home Detention vs. Incarceration</u>

Balancing the costs and effectiveness of home detention versus incarceration in this case indisputably favors confining Mr. Cavallaro at home.  According to a BOP report dated 3/31/04, incarceration of a single inmate costs $23,183.69 per year, and community confinement costs $19,087.94 per year.  <u>See</u> Report from U.S. Probation Officer Tricia Marcy, App. 454.  <u>Accord Willis</u>, 322 F. Supp.2d at 85 (reflecting similar costs for incarceration or community confinement).  Moreover, "[k]eeping infirm elderly people," like Mr. Cavallaro, "behind bars can cost up to three times more than imprisoning younger offenders …."  <u>Baron</u>, 914 F. Supp. at 664 & n.7 ($60,000 average annual cost of imprisonment for such inmates in 1995).  <u>See</u> <u>also</u> <u>Crumbliss</u>, 58 Fed. Appx. at 581 ("It costs the taxpayers of this country a lot of money to keep a healthy person in prison.  Quite obviously, the cost is compounded when that person is in such physical constraints that it's going to cause a lot of hospitalizations, medication, and treatment.").  Conversely, home detention of Mr. Cavallaro would cost the taxpayer nothing because it cost less than $10 per day to home confine a defendant and because Mr. Cavallaro would pay those costs and his own medical expenses.  <u>See</u> Marcy report, App. 454.

Finally, home confinement would be equally efficient as incarceration in this case.  Mr. Cavallaro "is not likely to be a recidivist; incapacitation at his age, with these conditions, could be a death sentence.  Retribution does not justify his incarceration.  The offense is not a crime of violence; the victim, the IRS, [has already been] repaid."  <u>Willis</u>, 322 F. Supp. at 85; <u>see</u> App.

---

defendant suffered from kidney disorder and obstructive sleep apnea); <u>Kloda</u>, 133 F. Supp.2d at 349 (downwardly departing, in part, on age and infirmity where 63-year-old defendant had bypass surgery and suffered heart disease); <u>United States v. Moy</u>, No. 90 CR 760, 1995 WL 311441 at *27-29 (N.D. Ill. May 18, 1995) (downwardly departing, in part, on age and infirmity where 78-year-old defendant suffered from depression and coronary artery disease); <u>United States v. Libutti</u>, No. 92-611 (JBS), 1994 WL 774647 at *10 (D.N.J. Dec. 23, 1994) (downwardly departing on defendant's physical and mental conditions where defendant suffered from heart condition and several psychiatric disorders including a panic disorder).

455-56 (Cavallaro's payment to IRS).  Contrast Brooke, 308 F.3d at 21 (home confinement not "equally efficient" as incarceration where defendant had been convicted of recent drug sales from his home).

    2.      Mr. Cavallaro's Diminished Mental Capacity Warrants a Departure.

The Court may also depart downward because Mr. Cavallaro was suffering from a diminished mental capacity within the meaning of U.S.S.G. § 5K2.13 at the time the offense was committed.  Section 5K2.13 encourages departures "if the defendant committed the offense while suffering from a significantly reduced mental capacity."  "Significantly reduced mental capacity," as defined in the commentary to section 5K2.13, means a "significantly impaired ability to (A) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (B) control behavior that the defendant knows is wrongful."  U.S.S.G. § 5K2.13, comment. n.1.  The "goal" of section 5K2.13 "is to identify defendants who are less culpable because their actions were rooted in their psychiatric problems."  United States v. Shore, 143 F. Supp.2d 74, 83 (D. Mass. 2001) (internal quotations omitted).  A departure is appropriate when such problems "contributed to some extent to the commission of the offense."  United States v. Aker, 181 F.3d 167, 174 (1st Cir. 1999).

Based on Mr. Cavallaro's clinical presentation, the detailed history reported by his family and treating professionals and in his treatment records, educational records and objective neuropsychological testing, it is Dr. Reade's opinion that Mr. Cavallaro suffers from a Major Depressive Disorder, a Panic Disorder and an Avoidant Personality Disorder, that he was suffering from those conditions at the time he committed the offenses, that they were improperly treated at that time and that this caused a significantly diminished mental capacity that substantially contributed to the commission of the offense.  See Reade, App. 363-64, 383-84.

Dr. Reade found ample data of chronic major depressive, anxiety and panic disorders satisfying the DSM-IV-TR criteria "dating back 30 years," with "waxing and waning courses" since then.  Reade, App. 383.  When suffering from depression or anxiety, Mr. Cavallaro "is less patient" and has "less emotional reserve for dealing with … frustrations."  Id., 381.  Dr. Reade believes, with a sufficiently degree of medical certainty, that Mr. Cavallaro was suffering from those psychiatric illnesses during the period of the offense conduct in the late-1990s.  Based on a close review of Mr. Cavallaro's psychiatric and medical records and clinical interviews of Mr. Cavallaro and his family, Dr. Reade determined that during that time period Mr. Cavallaro experienced a period of extreme distress resulting from, among other things, his daughter Patti's divorce, the sudden death of Mr. Cavallaro's brother (with whom he had the most close relationship) from colon cancer, and his own rash of illnesses in this time frame, including rectal bleeding.  Id., 381.  Records confirm that Mr. Cavallaro sought treatment from Dr. Kerzner on May 18, 1998 and received a four-month prescription for Imipramine on that date (App. 64), just two months before Mr. Cavallaro's 1997 tax return was filed.  Although Dr. Kerzner's records do not reflect that Mr. Cavallaro sought treatment from him again prior to April 1999 (when the 1998 tax return was filed), Dr. Kerzner acknowledged that Mr. Cavallaro was a "challenge to treat" because he failed to "seek[] help when he most needed it."  Id. 374, 381.

Moreover, as established by objective neuropsychological testing and supported by clinical interviews and contemporaneous observations by Mr. Cavallaro's family, he suffers from "significant cognitive deficits," which, among other things, impair his ability to read, "learn[] new information," "sustain[] mental effort" or comprehend "new and/or complex tasks."  Mr. Cavallaro is embarrassed by those limitations and seeks to conceal them by not "grappling with complex tasks that involve paperwork [or] written words" which "limit[] …his ability to make

informed judgments about complex accounting and bookkeeping matters, limit[] … his ability to manage paper, and limit[] … his ability to seek consultation when indicated." Id., 380

        Dr. Reade concludes:

> At the time of the offenses … Mr. Cavallaro suffered from a significantly reduced mental capacity.  His psychiatric illnesses, his personality disorder, his cognitive limitations and the host of external life stressors combined, in my opinion, to interfere with his ability to understand the wrongfulness of his actions, to exercise the power of reason, and to control his behavior.

> … Mr. Cavallaro's ability to understand the complexities of proper bookkeeping has been impaired by his cognitive handicaps.  He dealt with his tax reporting requirements in the same concrete and simple manner he has used more effectively in his business dealings.  He made calculations "in his head" about the loan he made to his business, and passively relied on others to provide the tax documents he then forwarded—without thought or scrutiny—to his accountant.  He did not exercise appropriate care by reading his income tax returns, because he cannot read very well, and is embarrassed by his deficits.

> Mr. Cavallaro's depression, anxiety, sleep deprivation and external stressors further reduced his mental capacity, in my opinion, by making him less patient, less able to deliberate, less able to consider the consequences of a given course of action and more likely to act precipitously.  Chronically fearful of being criticized or exposed as incompetent, Mr. Cavallaro additionally had trouble exercising a power of reason, and made decisions regarding his accounting, his taxes, and his bookkeeping impulsively.

> Because of his personality structure, Mr. Cavallaro has habitually avoided anxiety-provoking tasks.  His failure to read his tax return before signing it was related to this, as was his failure to recognize that he needed help in managing his bookkeeping and many of the financial affairs related to his business.  Mr. Cavallaro has had significant trouble controlling this behavior.  It is a practiced, ingrained style of functioning, and not a conscious shirking of responsibility.  Mr. Cavallaro avoided thinking about what he could not do well because it caused him shame.  In this anxiety-provoking situation, Mr. Cavallaro acted precipitously to resolve his anxiety—even when it was clearly not in his interest to do so.

Reade, App. 383-84.

These circumstances present an equally, if not more, compelling case for a diminished-capacity departure than other cases where courts have granted such departures.  For example, Mr. Cavallaro's psychiatric and neuropsychologic disorders are more severe than the defendant's disorders in United States v. Shore, 143 F. Supp.2d 74 (D. Mass. 2001), where a defendant, an owner and operator of a parking lot and seasonable boat tour business, committed tax offense by failing to disclose business income, then lied about it during a tax audit.  Id. at 76-77.  Unlike Mr. Cavallaro, the defendant in that case apparently had not been under psychiatric care prior to the initiation of the government's investigation, see id. at 82-83 (government argued symptoms were contrived), and instead relied wholly on a forensic psychiatrist, who opined that the defendant committed the offense while suffering from major depressive disorder and post-traumatic stress disorder stemming from the death of the defendant's child more than a decade earlier which made "it difficult for her to deal with detailed complicated matters, sorting out the pros and cons of disclosing this or answering a question in this way or that."  Id. at 82.  There was no evidence from the reported decision that objectively measurable neuropsychological testing supported the forensic diagnosis, as exists in Mr. Cavallaro's case.  The sentencing court still downwardly departed under section 5K2.13 from a 12-18 month range to impose a sentence of four months of home confinement.  Id. at 76.

Similarly, Mr. Cavallaro's mental conditions are worse than the defendant's conditions in United States v. Cockett, 330 F.3d 706 (6th Cir. 2003), where the Court of Appeals affirmed a diminished capacity departure for a defendant convicted of tax evasion for counseling others to falsely claim extra dependants on their returns.  Id. 707-08.  The sentencing court found that the defendant was suffering from "a depressive disorder and a thinking disorder" at the time of her offense conduct and departed from a sentencing range of 15 to 21 months to two years of

probation.  Id. at 710.  The Court of Appeals affirmed, rejecting arguments the defendant's

conviction for willful tax evasion somehow precluded the sentencing court from downwardly

departing under section 5K2.13, and confirming that expert psychiatric and neuropsychologic

reports, like the ones submitted in this case, provided a sufficient basis for the sentencing court's

decision to depart.  Id. at 713-16.  Cf. United States v. Herbert, 902 F. Supp. 827, 829-30 (N.D.

Ill. 1995) (departing where defendant, who embezzled and failed to report funds as income had

severe depressive disorder and other psychiatric problems which caused "depressed state

prompting [her] to question her own worth, make poor decisions, and then offer excuses to

compensate for her shortcomings").

> 3.    Aberrant Nature of Cavallaro's Offense Conduct Justifies a Departure.

Finally, a downward departure is warranted because of the aberrant nature of Cavallaro's

offense conduct within the meaning of Grandmaison.  The First Circuit has held that a

determination about whether an offense constitutes such an act of aberrant behavior "should be

made by reviewing the totality of the circumstances."  United States v. Grandmaison, 77 F.3d

555, 563 (1st Cir. 1996); United States v. Iaconetti, 59 F. Supp.2d 139, 144 (D. Mass. 1999).

Factors that may be considered in making this determination include "pecuniary gain to the

defendant, charitable activities, prior good deeds, and efforts to mitigate the effects of the crime."

Grandmaison, 77 F.3d at 563.  "Spontaneity and thoughtlessness may also be among the factors

considered, though they are not prerequisites for departure."  Id.  First-offender status, while

insufficient standing alone to justify a departure, also may be considered.  Id. at 564.[4]

---

[4]  The Sentencing Commission has twice amended the Guidelines with respect to "aberrant behavior"
since the offense conduct ended.  However, it is appropriate for the Court to assess Mr. Cavallaro's
qualification under the pre-2000 standard outlined above to avoid an ex post facto clause violation.  See
U.S.S.G. § 1B1.11(b).  See also United States v. Mikutowicz, 365 F.3d 65, 99 (1st Cir. 2004) (district
court applying 1998 Guideline Manual may depart downward based on aberrant conduct).

Mr. Cavallaro is a first-time offender, who, in nearly 70 years, has never had any criminal problem of any kind. On the contrary, Mr. Cavallaro has spent his life providing for his wife and family and for others through his performance of charitable activities and good deeds too numerous to list, but include: (1) providing employment for former prison inmates through work-release programs; (2) providing money and emotional support to former inmates as they transition into society; (3) supporting several church and religious groups through substantial financial support; (4) serving on building and real estate committees for non-profit churches; (5) giving flowers and plants to hospitals, charities, and numerous churches; (6) financially supporting inner-city sports leagues; (7) providing food, shelter and companionship for his parents-in-law; and (8) being a wonderful father and grandfather. See *supra* at 11-14.

Mr. Cavallaro has taken substantial steps to mitigate the circumstances of his offense conduct. He admitted responsibility for his offense and pleaded guilty, saving the government the time and expense of a trial. Additionally, he has already repaid the IRS the entire tax it claims is due, plus nearly $130,000 in interest payments and a total in excess of $303,000. See App. 455-56.

Finally, Mr. Cavallaro is not automatically disqualified for receiving an aberrant conduct departure because his offense involved two filings in successive years approximately nine months apart. As the First Circuit explained in Grandmaison "single acts of aberrant behavior" can include multiple acts leading up to the commission of a crime. 77 F.3d at 563. Mr. Cavallaro's criminal acts for both offenses involved a common pattern of overly relying on a wholly inadequate accounting and tax system and being willfully blind to its consequence. See United States v. Ribot, 97 F. Supp.2d 74, 85 (D. Mass. 1999) (granting aberrant conduct departure where defendant convicted of filing false tax returns over three year span). Contrast,

26

United States v. Bradstreet, 135 F.3d 46, 56-57 (1st Cir. 1998) (conduct not "aberrant" where defendant was convicted of securities fraud and testified dishonestly at trial).

B.     If the Court Imposes a Non-Incarceratory Sentence, Mr. Cavallaro Should Be Permitted to Continue to Work.

At the July 22, 2004 hearing, the counsel for the government asked, if the Court departed downward and imposed home confinement, whether it would impose a special condition so that Mr. Cavallaro not be permitted to work.  See 7/22/04 Tr. at 12.  This Court stated that, given the sentence is supposed to be punitive, it might be open to such a condition, but would "listen" to counsel before imposing it.  Counsel for Mr. Cavallaro believes that such a special condition is not warranted, and asks the Court not to order it.

As counsel for the government conceded at the July 22 hearing, defendants ordered to perform home confinement are typically permitted to work.  7/22/04 Tr. at 11.  Undersigned counsel's experience is that defendants serving home confinement are permitted to leave their homes at a certain hour and be home by a certain hour, thus limiting the number of hours a defendant may work in a week to around 40 hours.  Work is not only an expectation of the home confinement program; undersigned counsel's experience and belief is that defendants serving community confinement are required to work unless they are medically unable or otherwise excused from doing so.  Such policies reflect a clear preference that defendants serving such form of non-incarceratory sentences continue to work, and there does not appear to be any valid reason for ordering otherwise in this case.

On the contrary, restricting Mr. Cavallaro's ability to work – particularly as part of a blanket prohibition from doing any work at all and especially during the upcoming holiday season – could have disastrous effects on Mr. Cavallaro's two dozen employees, his business and his family.  Rivals within the wholesale flower business have circulated rumors that Mr.

Cavallaro will be going to jail and out of business.  <u>See</u> Affidavits of Peter Cavallaro, Jr., App. 452, ¶ 17; Nick J. Sprengers, App. 453B, ¶ 14.  If Mr. Cavallaro is physically unable to be at the business, he would be unable to inspect product, adjust prices and ensure the business operates properly and key suppliers have threatened to stop doing business with Albany Street.  <u>See</u> Affidavit of Kenny Robert Gilker, App. 447, ¶¶ 6-10; Cavallaro, Jr. Aff., App. 452, ¶¶ 16-18; Sprengers Aff., App. 453B, ¶¶ 13-17.  Such a scenario would jeopardize jobs at Albany Street – especially the jobs of the least qualified employees, including those on work-release who would have difficult finding employment elsewhere (<u>see</u> Cavallaro, Jr. Aff, App. 452-53, ¶¶ 18-19) – and threaten the future viability of the company, since as Mr. Gilker explains "[h]aving a problem with inventory volume for even one holiday season is a serious matter in the plant, flower and wreath business.  Disappointed customers tend to stay away."  <u>See</u> Gilker Aff., App. 447, ¶ 11; Sprengers Aff., App. 453B, ¶¶ 19-20 (decision of some suppliers to discontinue business with Albany Street "likely to have a snowballing effect on other suppliers" and could "significantly reduce the size of Albany St.'s business and could be fatal to it.").  To avoid that, this Court should not impose any special circumstances prohibiting Mr. Cavallaro from working while serving home confinement.

C.    <u>The Government Has Not Adequately Proven Tax Loss.</u>

Prior to the July 22, 2004 hearing, Mr. Cavallaro's counsel filed a Memorandum Regarding the Implications of <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004), in this case, arguing that ruling affects the sentencing process in federal courts generally and in this case in particular because the government did not prove a $173,531 tax loss to a jury or beyond a reasonable doubt nor did Mr. Cavallaro admit those facts in his pre-<u>Blakely</u> plea agreement or at his pre-<u>Blakely</u> plea hearing.  <u>See</u> Defendant's <u>Blakely</u> Memorandum, Dkt No. 12, at 2-7.  At the

July 22 hearing, the Court rejected that argument, stating that <u>Blakely</u> does not apply where a defendant agreed to a certain amount of tax loss in a plea agreement and noting that Mr. Cavallaro had "preserved [his] rights on that." 7/22/04 Tr. at 2-3. Out of abundance of caution and to avoid any subsequent claim of waiver or forfeiture, undersigned counsel renews his objection, briefly explains why we believe that a <u>Blakely</u> issue still exists and the remedies we seek to have applied.

The Indictment in this case does not allege any amount of tax loss to the government. Although Mr. Cavallaro entered into a plea agreement that listed the tax loss as $173,531, Mr. Cavallaro did so on March 17, 2004, months before the Supreme Court's <u>Blakely</u> ruling and without understanding his constitutional rights to have such facts decided by a jury and proven beyond a reasonable doubt. As reflected above and in the Affidavit of Craig Shuffain, App. 414-17, Mr. Cavallaro had meritorious grounds for disputing at least $90,000 in actual tax loss which Mr. Cavallaro would have disputed had <u>Blakely</u> been decided prior to entering into the plea. Thus, the evidence with respect to the tax loss amount is not overwhelming or uncontroverted.[5]

Because of the <u>Blakely</u> error in this case, we continue to believe that this Court should adopt the approach we advocated in our <u>Blakely</u> filing – *i.e.*, apply the Guideline provisions supported by the facts found by the jury or sworn to by the defendant (the elements of the tax offense, not the amount of tax loss) without applying additional Guideline provisions that would

---

[5] Even before <u>Blakely</u>, some sentencing courts adjusted the amount of tax loss under U.S.S.G. §§ 2T1.1 & 2T4.1 to reflect the actual tax loss by subtracting legitimate tax deductions and overpayments such as those described by Shuffain. <u>See</u>, <u>e.g.</u>, <u>United States v. Gordon</u>, 291 F.3d 181, 187 (2d Cir. 2002) (error for district court to refuse to consider any potential unclaimed deductions in calculating amount of tax loss); <u>Unites States v. Martinez-Rios</u>, 143 F.3d 662, 671 (2d Cir. 1998) (§ 2T1.1 "determination of the tax loss involves giving the defendant the benefit of legitimate but unclaimed deductions"). While other courts in other circuits have disagreed with that analysis, <u>e.g.</u>, <u>United States v. Chavin</u>, 316 F.3d 666, 677-79 (7th Cir. 2002), it doubtful that their rationale for doing so – that estimated tax loss is close enough for sentencing purposes and sentencing courts need not strive to determine correct tax if "perfect" return been filed on defendant's behalf – survives <u>Blakely</u>'s thrust for more accurate fact finding at sentencing.

require post-conviction judicial factfinding.  <u>See</u> Defendant's <u>Blakely</u> Memorandum at 3-4 (citing cases).  Utilizing that procedure, Mr. Cavallaro's offense level falls into a Zone A offense level and the Court may impose a sentence of home confinement without a downward departure.

<u>CONCLUSION</u>

For each of these reasons, Mr. Cavallaro respectfully requests that the Court impose the following sentence: (1) one year of Probation with a special condition that the defendant remain in home confinement for six months without electronic monitoring; (2) a fine at the high end of the appropriate range; and (3) a special assessment.

Respectfully submitted,

/s/ Michael B. Galvin_____
Michael A. Collora (BBO #092940)
Michael B. Galvin (BBO # 630515)
DWYER & COLLORA, LLP
600 Atlantic Avenue
Boston, MA  02210
671-371-1000

Dated:  October 6, 2004