UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | CRIMINAL NO. 04-10100-PBS |
| PETER CAVALLARO, SR. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## GOVERNMENT'S OPPOSITION TO DOWNWARD DEPARTURE

### Overview

Defendant Peter Cavallaro ("Cavallaro") is scheduled to be sentenced on October 13, 2004 in connection with his convictions for failure to disclose or pay taxes on unreported income of $508,742, consisting of $442,614.50 in diverted business receipts and $66,127.30 in unreported interest and capital gains income. Cavallaro has stipulated that the tax loss caused by his criminal conduct falls in the range from $120,000 to $200,000, that the resulting offense level under the Guidelines – after acceptance and before consideration of any motion for downward departure – is thirteen, and that his guidelines sentencing range is 12 - 18 months. For a complete discussion of the defendant's offense conduct, the United States refers the Court to the Government's Sentencing Memorandum, which was filed on July 15, 2004 in connection with a sentencing then scheduled for July 22, 2004.

On defendant's motion, the sentencing was continued to October 13, 2004. Seven days prior to that date, on October 6, Cavallaro filed an untimely[1] motion, 30-page memorandum and

---

[1] Paragraph 4 of the plea agreement required the defendant to file any departure motion and supporting memorandum "at least fourteen days prior to sentencing" or else be deemed to have waived any departure grounds not timely filed.

478-page appendix in which he requests a downward departure on three grounds: (a) diminished mental capacity (U.S.S.G. § 5K2.13); (b) age and physical infirmity (U.S.S.G. §§ 5H1.1 and 5H1.4); and (c) aberrant behavior.  Put succinctly, Cavallaro claims that he ought not be sent to prison because:  (a) he was mentally incapacitated by psychiatric illnesses and cognitive impairments at the time he committed the offenses; (b) he is too elderly and infirm to go to jail; and (c) his criminal conduct was a fleeting (aberrant) transgression in an otherwise exemplary life.

Defendant's arguments are without merit, for three principal reasons.  First, at the time of the offenses and continuing right up to the present, Cavallaro has skillfully managed and operated not one but several profitable businesses, amassing – literally from nothing – a multi-million dollar fortune in the process.  The defendant's demonstrated business abilities and considerable financial acumen are wholly inconsistent with the current effort to portray him as someone suffering from diminished mental capacity.

Second, by all accounts, including Cavallaro's own admission, he has performed and continues to perform the work of several employees, arising before dawn and working into the night, including six and seven days a week during holidays and other busy seasons.  The physical stamina and strength displayed by Cavallaro in his work life is, again, at odds with his current claim to be too elderly and infirm to go to jail.

Third, the course of conduct that resulted in Cavallaro's convictions extended over a two-year period of time and involved numerous affirmative acts by the defendant, stretching from the first business receipt that he is charged with having diverted, in April, 1997, to the last false tax return that he is charged with having filed, in April, 1999.  This two-year course of conduct constitutes neither a fleeting nor a momentary transgression.  It cannot be deemed aberrant.

For these reasons and for the additional reasons set forth below, no departure is warranted

2

on any of Cavallaro's proffered grounds.

## ARGUMENT

### I.     NO DEPARTURE IS WARRANTED FOR DIMINISHED CAPACITY

In order to establish diminished mental capacity under U.S.S.G. § 5K2.13, Cavallaro must demonstrate that he suffered from a significantly impaired ability to: (a) understand the wrongfulness of his criminal conduct or exercise the power of reason (often described as cognitive impairment); or (b) control behavior that he knew was wrongful (volitional impairment). U.S.S.G. § 5K2.13, app. note 1; see also United States v. McBroom, 124 F.3d 533, 548 (3rd Cir. 1997). Cavallaro premises his departure request on the first ground, contending that he committed his tax offenses during a time when depression, anxiety, cognitive impairments and a personality disorder all purportedly combined to render him unable to understand the wrongfulness of his conduct or exercise the power of reason. In support of his contentions, Cavallaro has submitted two reports: a psychiatric evaluation prepared by Dr. Julia Reade (A. 0363) and a neuropsychological evaluation prepared by Dr. William Stone. (A. 0392).[2]

Four principal facts undercut Cavallaro's arguments and the conclusions of Drs. Reade and Stone. First, contrary to the characterization of Dr. Reade, the tax offenses at issue did not involve "complex accounting and bookkeeping matters" that required advanced cognitive abilities or expertise to understand. (A. 0381). The legal obligation that Cavallaro violated was a simple one: income received must be reported. Cavallaro didn't. Among other things, he diverted over $400,000 in business receipts into his personal accounts and did not report or pay taxes on any of it. (PSR ¶ 12).

---

[2] Citations in the form "(A. ___)" are to the Appendix to Defendant's Sentencing Memorandum and Motion for Downward Departure.

3

Second, the facts do not support Dr. Reade's description of the defendant as a man so impaired by psychiatric illness and by cognitive impairments that he could not understand the nature and wrongfulness of his conduct or exercise the power of reason. As described in the Presentence Report and, indeed, elsewhere in Dr. Reade's own report, Cavallaro is an enormously successful businessman who has built a multi-million dollar fortune through his formation, operation and management of several profitable businesses. (PSR ¶¶ 81-84). Dr. Reade describes him as "a highly successful businessman" who "handles various financial negotiations well", "has a talent for real estate transactions," and manages "multiple demanding enterprises," including a wholesale flower market in Boston, a greenhouse business in Lexington, and a large greenhouse/retail plant operation in North Reading. (A. 0381, 0370). This evidence of Cavallaro's business and financial abilities is wholly inconsistent with the current effort to portray him as someone hamstrung by such severe cognitive limitations and psychiatric disorders that he qualifies for a departure on diminished capacity grounds.

Third, it bears emphasis that virtually all of the conduct charged in the Information to which Cavallaro has pled guilty involved acts of commission, not omission. Put differently, this is not a case where Cavallaro simply overlooked or "forgot" to do something. He actively diverted hundreds of thousands of dollars of business receipts into his personal accounts. (PSR ¶¶ 12-14). Proof that this was no fatigue or disability-induced "oversight" is evidenced by Cavallaro's conduct in explicitly directing that seven of the diverted checks – paid over an eighteen month period of time and totaling $380,000 – be made payable to him personally or to his wife, *not* to his business, even though the checks constituted payments for services rendered by the business. (PSR ¶ 13) (See Exhibit 1 (reproducing copies of the seven checks)). Moreover, as to two of these checks, Cavallaro promptly took advantage of the fact that he had instructed the vendor to make the checks

4

out to him by depositing the checks into his business's account and falsely characterizing them as a loan of personal funds from himself to the company, when they were not. (PSR ¶ 14) (See Exhibit 2 (reproducing false checkbook entry and deposit items).

Notwithstanding Cavallaro's current efforts to pin the blame on his accountant, it was Cavallaro, not the accountant, who diverted the receipts into his personal accounts; Cavallaro, not the accountant, who directed that $380,000 in vendor checks be made payable to himself (or his wife) personally, rather than to the business; and Cavallaro, not the accountant, who thereafter falsely characterized two of those checks as a shareholder loan. The affirmative nature of the foregoing conduct further undercuts the defendant's current assertion that he acted unknowingly.

Fourth, Cavallaro's diminished capacity arguments – in particular, his repeated denials that he "set out to disobey the law" (A. 0364) – are refuted by his plea. In the parties' plea agreement, Cavallaro "expressly and unequivocally admits that he in fact knowingly, intentionally and willfully committed the crimes charged in counts one and two of the Information, and is in fact guilty of those offenses." (Plea Agreement ¶ 1).[3] Having made that admission, Cavallaro's current effort to disclaim knowledge or understanding should be rejected.

Finally, in further support of its opposition to a diminished capacity departure, the United States submits, at Exhibit 3, a Psychiatric Evaluation prepared by Dr. Allison Fife. As Dr. Fife explains in her report, she was retained by the government to perform an evaluation of Cavallaro. She reviewed, inter alia, the reports of Drs. Reade and Stone as well as all of the medical and psychiatric records produced by the defendant. She also conducted a two hour examination of the defendant.

---

[3] A copy of the parties' plea agreement is attached to the PSR.

Based on her review and examination, Dr. Fife disagrees with the diminished capacity arguments set forth in the reports that the defendant has submitted from Drs. Reade and Stone. Noting Cavallaro's considerable skill and success at running multiple businesses, the intermittent nature of his symptoms, and the millions of people who lead productive and organized lives with both anxiety and depressive disorders, Dr. Fife expresses her opinion that "Mr. Cavallaro's psychiatric illness has been overstated in its interference with [his] abilities." (Ex. 3, at 4.)  She concludes:

> Mr. Cavallaro has a history of Depression and Panic Disorder, but has shown overwhelming evidence of a level of success in business and real estate such that I cannot reasonably conclude that he was in any way impaired by these issues so as not to appreciate that his actions were wrong, or render him unable, or even less able, to conform to the law.

(Ex. 3, at 5).

For all of the reasons summarized above, the evidence in this case compels the conclusion that Cavallaro acted intentionally and deliberately, not that he acted unknowingly or uncontrollably. No grounds exist for a departure based on diminished capacity.

## II.    NO DEPARTURE IS WARRANTED FOR AGE OR PHYSICAL INFIRMITY

Age, health and physical condition are discouraged bases for departure under the Guidelines – i.e., they are factors that are "not ordinarily relevant to the determination of whether a sentence should be outside the applicable guideline range."  U.S.S.G. Ch.5, Pt.H, intro. comment; see also U.S.S.G. §§ 5H1.1, 5H1.3 and 5H1.4.  A district court may depart on the basis of a discouraged factor only in an "exceptional case."  U.S.S.G. Ch.5, Pt. H, intro. comment.  Koon v. United States, 518 U.S. 81, 95-96 (1996) (courts should depart for a discouraged factor only when it is present to an exceptional degree); United States v. Rivera, 994 F.2d 942, 948 (1st Cir. 1993) (same); United

States v. Brooke, 308 F.3d 17, 19 (D.C. Cir. 2002); see also United States v. Maldonado-Montalvo,

356 F.3d 65, 74 (1st Cir. 2003); United States v. LeBlanc, 24 F.3d 340, 348 (1st Cir. 1994).

      In assessing whether a defendant's physical condition truly presents an "exceptional" case,

most courts have identified the central issue as revolving around the Bureau of Prisons' ability to

provide adequate treatment services, which the First Circuit has defined as services on "'a level

equally commensurate with modern medical science and of a quality acceptable within prudent

professional standards.'"  United States v. Derbes, 369 F.3d 579, 583 (1st Cir. 2004), *quoting*

United States v. DeCologero, 821 F.2d 39, 43 (1st Cir. 1987); see also United States v. Studley, 907

F.2d 254, 258 (1st Cir. 1990) ("[a] defendant's unique mental or emotional condition is only relevant

if the [BOP] does not have adequate treatment services."); United States v. Hilton, 946 F.2d 955,

960 & n. 5 (1st Cir. 1991) (no extraordinary physical impairment within the meaning of U.S.S.G. §

5H1.4 because the BOP could adequately accommodate the defendant's medical needs); United

States v. LeBlanc, 24 F.3d at 348-349 ("no evidence that the [BOP] would be unable to adequately

accommodate LeBlanc's medical needs"); United States v. Lujan, 324 F.3d 27, 31 (1st Cir. 2003)

(same).

      As a corollary to this issue, courts also have examined whether a defendant's condition is

such that a lengthy imprisonment would work "irreparable harm."  United States v. Maldonado-

Montalvo, 356 F.3d at 74.[4]  In considering these factors, the First Circuit repeatedly has stressed its

stringency in distinguishing between health problems that may be serious but that are not

"extraordinary" and health problems that truly present an "extraordinary" case.  Derbes, 369 F.3d at

---

    [4] In all but exceedingly rare situations, the ability of the Bureau of Prisons ("BOP") to
provide adequate treatment will resolve any concern about the possibility of a defendant's suffering
irreparable harm while incarcerated.

583.  Only the latter can justify a departure.

The evidence introduced by Cavallaro is not sufficient to clear the governing thresholds under U.S.S.G. §§ 5H1.1 or 5H1.4.  Although he has received treatment over the years for a variety of physical and mental health issues, Cavallaro cannot and has not established that the Bureau of Prisons would be unable adequately to accommodate his medical and psychiatric needs, or that the relatively brief, twelve month period of incarceration required by the Guidelines would cause him to suffer irreparable harm.  In fact, the evidence demonstrates the contrary, in two respects.

First, the defendant's description of his own activities is inconsistent with his current claims of physical and mental fragility.  By his own account, and the accounts of others, Cavallaro works strenuous hours – on the order of 15 or more hours per day – and has done so for countless years. (A. 0012, 0027, 0044, 0050, 0366, 0450).  The physical and psychological ailments on which he premises his departure motion have been present throughout much of this time period.  (A. 0372). Save for a few discrete time periods, they have not prevented – or even noticeably hindered – Cavallaro in continuing with his vigorous work life.  He has done so – with considerable success and to the awe of his family and friends.  Cavallaro's active life undercuts his current attempt to portray himself as a man so "infirm" and/or "extraordinarily" incapacitated that he cannot safely serve a 12 month prison term.

Second, at the prosecution's request, the Bureau of Prisons has examined Cavallaro's medical records and verified its ability to provide him with adequate medical and psychiatric treatment.  Attached at Exhibit 4 is a letter from BOP Health Systems Administrator Barbara Cadogan specifically cataloging the BOP's experience at treating thousands of inmates with the same or similar conditions as those presented by the defendant, including over 4,000 inmates with depression and/or panic disorders, approximately 25,000 inmates with hypertension, approximately

4,000 inmates with diabetes, and inmates with sleep apnea who require the use of a C-PAP device. As the letter demonstrates, and contrary to the defendant's characterization, the BOP has not simply expressed a *belief* that it has the staff and expertise to provide whatever treatment Cavallaro might require; it has set forth in its letter concrete facts and statistics establishing that it actively furnishes such care to thousands of inmates with the same medical problems.

Defendant responds with four principal contentions. He argues: (1) that *any* infirmity, when combined with age, is sufficient to justify a departure, irrespective of whether the underlying facts qualify as "exceptional"; (2) that, in any event, he possesses a "combination" of infirmities that makes him exceptional, and the BOP is unable to treat that "combination"; (3) that even if BOP could provide adequate treatment, home confinement would be less expensive – a cost savings that Cavallaro claims further requires a departure; and (4) that other courts have granted age and infirmity-based departures on equal or lesser facts. As demonstrated below, each of these arguments is flawed.

First, the Guidelines list both age and physical condition as *discouraged* grounds for departure. See U.S.S.G. §§ 5H1.1, 5H1.4. By definition, therefore, a defendant seeking a departure on either or both of these grounds bears the burden of demonstrating that his situation presents an "exceptional" or "extraordinary" case. Koon v. United States, 518 U.S. at 95-96; United States v. Brooke, 308 F.3d at 19. Contrary to Cavallaro's assertions, a defendant cannot satisfy this burden simply by establishing that he or she is over 65 and has some medical problems. Without more, that does not qualify as exceptional. United States v. Krilich, 257 F.3d 689, 693 (7th Cir. 2001) (§§ 5H1.1 and 5H1.4 require the showing of an "extraordinary" ailment); United States v. Marin-Castaneda, 134 F.3d 551, 556-57 (3rd Cir. 1998) ("absent some extraordinary infirmity," advanced age does not warrant a downward departure); United States v. Seward, 2002 WL 31103488, at *3

9

(N.D. Ill. 2002) (defendant must show that his age and medical condition are "extraordinary") .

Second, turning to the specifics of Cavallaro's situation, there is nothing "exceptional" or even unusual about his age or his particular health conditions, whether considered separately or in combination. Millions of Americans suffer from depression and anxiety disorders. As the First Circuit has made clear, it is not enough for a defendant to establish that he (or she) does, too. More must be shown. United States v. Maldonado-Montalvo, 356 F.3d 65, 75 (1st Cir. 2003). Similarly, large numbers of adults are overweight and, as they age, experience a constellation of associated health problems, including (as in Cavallaro's case), hypertension, diabetes, high cholesterol and sleep apnea. That Cavallaro has these conditions is not exceptional; it is all too common. As the Seventh Circuit observed in Krilich:

> [M]any septuagenarians have conditions similar to [the defendant's]. Yet § 5H1.1 and § 5H1.4 put normal age-related features off limits as grounds for reduced sentences. Older criminals do not receive sentencing discounts. Many persons in poor health are confined in federal prisons.

Krilich, 257 F.3d at 693; see also United States v. Seward, 2002 WL 31103488, at *3 (N.D. Ill. 2002) (defendant must show that his condition is "extraordinary" to warrant a departure under §§ 5H1.1 and 5H1.4; proof of advanced age and medical problems, alone, are not enough).

The BOP, as is true with the entire American health care system, has developed programs to address the foregoing health issues, including the diabetes and hypertension programs described in Administrator Cadogan's letter. See Exhibit 4. Cavallaro has not put forth any medical or mental health conditions, in combination or otherwise, that the BOP does not have the staff, programs, medications, equipment, facilities, expertise and experience to treat.

Third, on the facts of this case, cost should not be deemed a dispositive factor justifying a downward departure. It will *always* be the case that home detention is cheaper than incarceration.

That is true for every single inmate in the BOP system, including both those who receive medical and/or psychiatric services and those who do not. More is required to justify a departure than simply the lower cost of home confinement. There must be something about the defendant, his age, and his infirmities that causes his situation to qualify as exceptional. Cf. United States v. Maldonado, 242 F.3d 1, 4 (1st Cir. 2001) (in "extraordinary " cases, §§ 5H1.1 and 5H1.4 indicate that expense may be considered). Cavallaro has failed to clear that threshold. His health issues are common obesity and age-related issues. His depression and anxiety disorders are shared by millions of Americans. Moreover, as set forth above, the BOP already has in place everything it needs to provide adequate care to Cavallaro. It currently furnishes such care to thousands of other inmates. Cavallaro's incarceration will cost no more than the incarceration of the many other inmates who receive the same or similar services.

Fourth, Cavallaro's citations to other cases in which departures were granted on the basis of age, infirmity or mental condition do not get him over the bar. Each case is obviously different and must be considered on its own facts. Many of Cavallaro's citations provide insufficient information to ascertain whether the cases presented analogous situations or not. (See, for example, the unpublished dispositions cited at A. 464). Other cases plainly are distinguishable. E.g., United States v. Maltese, 1993 WL 222350 (N.D. Ill. 1993) (departure granted to 62-year old defendant with liver cancer who was not expected to live out the year).

Moreover, there are an equal, if not greater, number of cases in which courts have denied departures notwithstanding physical (and/or psychological) conditions that, from the descriptions, appear to have been materially more severe than the conditions presented by Cavallaro. E.g., United States v. Lujan, 324 F.3d 27 (1st Cir. 2003) (defendant's cirrhosis and calcified arteries did not warrant departure); United States v. LeBlanc, 24 F.3d 340, 348-49 (1st Cir. 1994) (heart

11

condition did not warrant departure); United States v. Woodward, 277 F.3d 87, 90, 92 (1ˢᵗ Cir. 2002) (no departure for defendant with a large number of 'severe and very life limiting' physical infirmities - including being paralyzed and confined to a wheelchair, having three blocked arteries in his heart and diabetes, taking 10-14 medications and having been hospitalized many times); United States v. Johnson, 318 F.3d 821, 824 (8th Cir. 2003) (coronary heart disease and Hodgkins disease, and reversing departure); United States v. Krilich, 257 F.3d at 692 (69-year old defendant with pulmonary, cardiovascular, and peripheral vascular disease, and reversing departure); United States v. Persico, 164 F.3d 796, 801 (2d Cir. 1999) (triple bypass, kidney cancer, hypertension); United States v. Guajardo, 950 F.2d 203, 208 (5th Cir. 1991) (cancer, high blood pressure, amputee); United States v. Carey, 895 F.2d 318, 324 (7th Cir. 1990) (brain tumor); United States v. Seward, 2002 WL 31103488, at *3 (N.D. Ill. 2002) (76-year old defendant with diabetes, hypertension and ulcers); United States v. Tolson, 760 F.Supp. 1322, 1331 (N.D. Ind. 1991), aff'd, 988 F.2d 1494 (7th Cir.) (pulmonary condition); United States v. DePew, 751 F.Supp. 1195, 1199 (E.D. Va. 1990), aff'd, 932 F.2d 324 (4th Cir. 1991) (HIV status).

In the end, the government circles back to where it began.  For all the dueling experts, the competing arguments, and the countervailing lists of cases, the one irrefutable fact is the hard-working life that Cavallaro has led and continues to lead.  The United States simply does not find it credible for a man who as recently as the last hearing before this court on July 22, 2004 still was working 15-hour days;[5] who is described by family, friends, and colleagues as "one of the hardest working people anywhere" (A. 0012, 0027, 0044, 0050, 0366, 0450); and who, by his son's account, still takes his turn responding to the 3 a.m. frost alarm at the greenhouses (A. 0012), to

_____

[5] In response to a question from the Court at the July 22 hearing, Cavallaro stated, through counsel, that his work day runs from 4 a.m. to 7 p.m.

claim that he is too physically (and mentally) infirm to go to prison. The strenuous work life that Cavallaro leads belies the claims of infirmity that he now makes. No age or health-based departure is warranted.

## III.   NO DEPARTURE IS WARRANTED FOR ABERRANT BEHAVIOR

Cavallaro advances a collection of additional assertions in support of his requested departure, which he groups under the heading "aberrant behavior." He cites to a life of good deeds, various charitable activities, mitigating circumstances that, in his view, diminish his culpability for the offenses that he committed, and his repayment of the taxes that he evaded. Packaging all of these together, Cavallaro argues that the court should depart downward to a non-incarcerative sentence based on the allegedly "aberrant" nature of his conduct in an otherwise exemplary life.

For the reasons set forth below, Cavallaro's assertions are deficient on multiple levels.

### A.   Cavallaro Has Waived His Right to Move for an Aberrant Behavior Departure

As a threshold matter, the government asks the court to reject the defendant's aberrant behavior argument (and all of his associated contentions) as untimely filed and hence procedurally (and contractually) waived. The defendant entered into a plea agreement that required him to file any "motion for a downward departure, and any legal memoranda in support thereof, at least fourteen days prior to sentencing." The agreement further provided that "Any departure grounds not raised and filed with the Court fourteen days prior to sentencing shall be deemed waived." (Plea Agreement ¶ 4).

The defendant has breached the foregoing provision twice. He filed no departure motion prior to the first scheduled sentencing date: July 22, 2004. Instead, he submitted – on July 21 – two expert reports addressing his alleged diminished capacity, and he requested a continuance. The court allowed the continuance and rescheduled the sentencing to October 13. Again, the defendant

13

filed no departure motion or memorandum by the 14-day deadline specified in the plea agreement. Instead, just 7 calendar days – and 4 working days – prior to the sentencing date, defendant filed a 30-page brief and a 478-page appendix advancing three departure arguments.

The tardiness of defendant's submission is no mere technical breach. It has materially prejudiced the government's ability to prepare a response by effectively compressing to 48 hours the time within which the government must review, research, draft and file an opposition if the court is to have any time to review the government's pleadings before the sentencing date. The government negotiated a 14-day advance filing provision in the plea agreement precisely to avoid this situation.

The government assented, without complaint, to a continuance to accommodate the defendant's difficulty in completing his pleadings prior to the first scheduled sentencing date, two and a half months ago. It is less charitably inclined the second time. If the timing provision is to have any meaning -- if sentencings are to proceed in an orderly fashion on the dates on which they are scheduled -- the government requests that the provision be enforced.

The government notes that it is seeking to strike only the defendant's aberrant behavior argument (and associated contentions). Although the government did not timely receive – as it should have – Cavallaro's motion and brief seeking a departure on diminished capacity and age/physical infirmity grounds, it at least was in receipt of the expert reports and medical records that relate to the latter two issues.

B.    Cavallaro's Aberrant Behavior Argument Is Substantively Without Merit

If the court elects to reach the substance of the defendant's argument, the government submits that Cavallaro's conduct cannot be deemed "aberrant behavior" under either the "totality of the circumstances" standard of United States v. Grandmaison, 77 F.3d 555 (1st Cir. 1996) or the

14

standard articulated in U.S.S.G. § 5K2.20.[6]  Although not identical, both standards examine the

extent and duration of the defendant's conduct.  They also consider the defendant's motivations for

committing the crime, including any pecuniary gain; the existence of a prior criminal record or,

conversely, prior good deeds and charitable activities; and any efforts by the defendant to mitigate

the effects of his crime.  E.g., Grandmaison, 77 F.3d at 563; Zecevic v. United States Parole

Commission, 163 F.3d 731, 734-35 (2d Cir. 1998) (applying totality of the circumstances standard);

United States v. Rivera-Rodriguez, 318 F.3d 268 (1st Cir. 2003) (applying § 5K2.20).

Here, Cavallaro's criminal conduct extended over two full years, from the first business

receipts that he began diverting in April, 1997 (PSR ¶ 12) to the last false tax return that Cavallaro

signed and filed in April, 1999.  (PSR ¶ 15).  Over the course of this two-year period, Cavallaro

diverted, concealed, and failed to pay taxes on more than $500,000 in unreported income, consisting

of 18 diverted checks and over a dozen months of unreported interest and capital gains payments.

(PSR ¶¶ 12-23).  Such repeated conduct, over the extended time period involved, and for a clearcut

pecuniary gain, cannot be characterized as "aberrant."

Cavallaro seeks to counterbalance the foregoing conduct by emphasizing his absence of a

criminal record, his good deeds and charitable activities, and his post-detection repayment of the

taxes that he evaded.  On the issue of criminal record, however, Grandmaison makes clear that first

---

[6] The Second Circuit, which applied a totality of the circumstances standard prior to the adoption of § 5K2.20, has deemed the latter guideline provision a "clarifying" amendment and hence applicable to offense conduct that pre-dates the amendment's adoption in November, 2000. United States v. Gonzalez, 281 F.3d 38, 46-47 (2d Cir. 2002).  The First Circuit has noted the issue but not does not appear to have been presented with a disputed case requiring it to squarely decide the issue.  See United States v. Dewire, 271 F.3d 333, 335 n.2 (1st Cir. 2001).  As established by the discussion in the body of this memorandum, Cavallaro certainly would not be entitled to an aberrant behavior departure under § 5K2.20.   He also is not entitled to a departure ever under the more lenient standard of Grandmaison.

offender status is not synonymous with aberrant behavior.  77 F.3d at 564.  On the issue of

charitable good deeds, courts have made equally clear – most frequently when discussing requests

for charitable good works departures under U.S.S.G. § 5H1.11 – that it is not uncommon for

successful businessmen, like Cavallaro, to have a record of good deeds and charitable giving.

Relying on such activities as the basis for granting sentence reductions risks granting people an

impermissible benefit based, at least in part, on their socioeconomic status.  E.g., United States v.

Thurston, 358 F.3d 51, 78-80 (1st Cir. 2004) (not surprising for business leaders to engage in civic

and charitable activities); United States v. Morken, 133 F.3d 628, 630 (8th Cir. 1998) (defendant's

community activities, although laudable, were neither exceptional nor out of the ordinary for

someone of the defendant's income and preeminence in his town); United States v. Crouse, 145

F.3d 786, 792 (6th Cir. 1998) (similar); United States v. Kohlbach, 38 F.3d 832, 838 (6th Cir. 1994)

(deeming it "usual and ordinary" in white-collar crimes involving executives to find that a

defendant was involved as a leader in community charities, civic organizations, and church efforts);

United States v. Haversat, 22 F.3d 790, 796 (8th Cir. 1994) (same).

    With respect to Cavallaro's repayment of the evaded taxes, courts have underscored the

importance in tax and fraud cases of examining *when* the repayment took place – i.e., was it before

or after the defendant learned that his criminal conduct had been detected.  Post-detection

repayments, as occurred with Cavallaro here, carry less weight.  E.g., United States v. Hairston, 96

F.3d 102, 108-09 (4th Cir. 1996) (defendant was not entitled to a downward departure when she did

not pay bank until after she had been criminally indicted, in order to settle her civil liability, and in

the hope of receiving a reduced sentence); United States v. Miller, 991 F.2d 552, 553-54 (9th Cir.

1993)(court delineated three constraints to departures based on payment of restitution; one being

"payment had to have been genuinely voluntary, rather than motivated primarily by a collateral

16

consideration such as a desire to settle the civil lawsuit against her... ."); see also United States v. Bogdan, 284 F.3d 324, 330 (1st Cir. 2002) ("It is not uncommon for defendants to discover the virtues of introspection and remorse when facing the threat of punishment. ...").[7]

For all of these reasons, Cavallaro's conduct does not qualify as "aberrant."

## IV.    CAVALLARO'S REMAINING ARGUMENTS ARE DEFICIENT

Cavallaro makes two final assertions in his memorandum that warrant a brief response.

### A.    Home Confinement

First, Cavallaro argues that if the court departs downward to a non-incarcerative sentence and imposes home confinement, he should be permitted to leave his home to work or else the viability of his company will be gravely threatened. To this, the government offers four observations.

One, as stated above, the government does not believe that any downward departure is warranted. If Cavallaro is sentenced to a term of imprisonment consistent with his guidelines sentencing range, this issue will be rendered moot.

Two, the government questions the direness of the predictions contained in the three supporting affidavits filed by the defendant. (A. 0447-0453B). The affiants consist of the

---

[7] In the analogous area of presentence rehabilitation based in part on the cessation of drug use, the First Circuit has made clear that to warrant a reduction in a defendant's sentence beyond that permitted by §3E1.1, the defendant's "rehabilitation" must come before he has been arrested, or has become aware that he is under investigation. This is so because "[s]ome degree of pre-sentence rehabilitation is usually to be expected from a penitent defendant, or one who genuinely shoulders responsibility, or even from one who simply wants to put his best foot forward at sentencing, hopeful of lightening the load." United States v. Sklar, 920 F.2d 107, 116-17 (1st Cir. 1996); see also United States v. Craven, 239 F.3d 91, 99 (1st Cir. 2001) ("The reason that timing matters in rehabilitation cases is that a defendant who decides independently to turn his life around likely deserves higher marks than one who undertakes rehabilitation mainly (or at least partially) to gain advantage in imminent criminal proceedings.").

defendant's son, Peter Cavallaro, Jr., who has an understandable motivation to try to help his father, and two longtime vendors, Kenny Gilker and Nick Sprengers, who first submitted letters to the Court back in April and May expressing their heartfelt respect for and (in Gilker's case) gratitude to the defendant (A. 0020-22, 0046-47), and yet now state, far more coldly, that they would have to "reevaluate" the business they would be willing to do with Cavallaro's son if the defendant weren't working "on site" at the company. (A. 0447, 0453B). The abrupt change in tone, which seems clearly designed to better support the defendant's current legal arguments, casts doubt on the affiants' credibility.

Three, the impact that Cavallaro's absence might have on his business is a factor that will be present in virtually every criminal case that involves the principal of a small corporation. It raises troublesome questions of fairness and equity if a defendant were to receive a more lenient sentence by virtue of the fact that he owns a business. Cf. United States v. Sharapan, 13 F.3d 781, 785 (3d Cir. 1994) ("nothing extraordinary" about the claim that defendant's imprisonment "may cause harm to the business and its employees; the same is presumably true in a great many cases in which the principal of a small business is jailed"); United States v. Rutana, 932 F.2d 1155, 1158 (6th Cir. 1991) ("nothing special" about an industrial polluter who happens to be an employer because the "very nature of the crime dictates that many defendants will likely be employers, whose imprisonment may potentially impose hardship upon their employees"); see also United States v. Olbres, 99 F.3d 28, 36 (1st Cir. 1996) (incarceration of a defendant inevitably means that the defendant will no longer be employed in his previous position and that fact inevitably will have consequences).

Four, the government questions the true extent of the "punishment" that actually would be imposed upon Cavallaro if he were permitted to maintain his pre-conviction work schedule. There

18

would be little meaningful "confinement" in home confinement – much less any sanction likely to

deter others – if Cavallaro were allowed to be away from his house at work six or seven days a

week.  He would effectively be leading the same life that he led prior to being sentenced.

     B.    _Blakely_

Cavallaro's final argument is simply a renewal of his previous contention that the Supreme

Court's decision in <u>Blakely v. Washington</u>, 2004 WL 1402697 (June 24, 2004), should be applied

to this case in such a way as to cap his maximum sentence at the guidelines range that corresponds

to the base offense level for tax cases – i.e., 0 - 6 months.

As this court already has concluded, however, even if the Supreme Court ultimately holds

that <u>Blakely</u> applies to the federal Sentencing Guidelines, the sentencing outcome in this case would

be the same.  That is because, even under the reasoning of the majority opinion in <u>Blakely</u>, "[w]hen

a defendant pleads guilty, the State is free to seek judicial sentence enhancements so long as the

defendant either stipulates to the relevant facts or consents to judicial factfinding."  2004 WL

1402697, at *8.

Here, Cavallaro has stipulated that the combined tax loss caused by the offenses to which he

has pleaded guilty – i.e., counts one and two of the Information – was "more than $120,000 and not

greater than $200,000."  (Plea Agreement ¶ 3(c)).  He further stipulated that this loss resulted in a

Guidelines offense level, prior to acceptance, of fifteen.  (<u>Id.</u> ¶ 3(d)).  The government is not

requesting that the Court decide or impose any contested fact-based enhancements to this level.

Because a Guidelines sentence can be calculated in this case without any upward

enhancements beyond the defendant's admissions and stipulations, the Guidelines remain applicable

-- even under <u>Blakely</u> – and Cavallaro should be sentenced under them.[8]

## CONCLUSION

For all of the foregoing reasons, the United States requests that the defendant's motion for a downward departure be denied and that he be sentenced within the applicable guidelines range.

Respectfully submitted,

MICHAEL J. SULLIVAN
United States Attorney

By:    **/s/ Michael J. Pineault**
Michael J. Pineault
Assistant U.S. Attorney
United States Courthouse, Suite 9200
1 Courthouse Way
Boston, MA  02210
(617) 748-3261

Dated: October 8, 2004

---

[8] Cavallaro's current efforts to retract his stipulation and argue for a lower loss figure should be rejected.  He is bound by his plea and has no entitlement, post-conviction, to try to rewrite his tax returns for the purpose of reducing the loss caused his tax evasion.  <u>E.g.</u>, <u>United States v. Chavin</u>, 316 F.3d 666, 677-79 (7th Cir. 2002) (defendant has no right, after being convicted of tax fraud, to try to recalculate his tax return after-the-fact in an attempt to reduce the amount of his liability for sentencing purposes); <u>United States v. Spencer</u>, 178 F.3d 1365, 1368 (10th Cir. 1999) (same).