

**MASSACHUSETTS GENERAL HOSPITAL**



**HARVARD MEDICAL SCHOOL**

Law & Psychiatry Service
60 Staniford Street
Boston, Massachusetts 02114-2517

Tel: 617.726.1040, Fax: 617.724.2808

Julia M. Reade, M.D.
*Adult Forensic Services*
*Children & the Law Program*

*Charlesbank Corporate Health*

Michael Collora, Esq.
Michael Galvin, Esq.
Dwyer & Collora, LLP
Federal Reserve Plaza
600 Atlantic Avenue
Boston, MA 02210

October 11, 2004

Re: Peter Cavallaro

Dear Mssrs. Collora and Galvin,

At your request I reviewed the transcript of the September 3, 2004 interview of Mr. Cavallaro by Dr. Alison Fife, and reviewed her psychiatric evaluation dated October 6, 2004. What follows is a brief report of my findings.

Although there are many minor factual inaccuracies in Dr. Fife's report that suggest carelessness or haste, there are other statements in her report that raise questions about the thoroughness of her examination. For example, Dr. Fife asserted that Mr. Cavallaro was "fully oriented," and without delusions or hallucinations. At another point, Dr. Fife stated: "While it is true that his anxiety and mood are worse now as a result of the penalties he may be facing..." It is unclear how Dr. Fife determined these things, because the transcript of her interview contains no evidence that she asked Mr. Cavallaro the questions necessary to make these assessments.

Dr. Fife also distorted Mr. Cavallaro's meaning several times in the body of her report, leaving the reader with an incorrect impression regarding Mr. Cavallaro's assessment of his thoughts, motivations or actions. Review of my report and the transcript of Dr. Fife's interview contradict portions of Dr. Fife's written report. Dr. Fife's characterization, in these instances, implies that Mr. Cavallaro was trying to evade responsibility for his actions and that his behavior was knowing and deceitful.

For example, on page two of her report, Dr. Fife wrote: "Mr. Cavallaro blamed stress, mental fatigue, anxiety, and depression for his failure to appropriately manage his money, bills, and taxes." In his interview with Dr. Fife, however, Mr. Cavallaro actually stated

that he did not know whether his fatigue or depression contributed to his carelessness and impulsivity. He reported, "I'd just be confused a lot of times."

In the next paragraph, Dr. Fife noted that Mr. Cavallaro signed the income tax returns prepared by his accountant "without reading them in detail." As Mr. Cavallaro told both Dr. Fife and me, he did not read his tax returns at all before signing them. A few sentences later, Dr. Fife wrote: "Mr. Cavallaro asserts that…he simply did not know that it may be wrong to not report the business income." This is a distortion of Mr. Cavallaro's actual statements that he misunderstood how his transactions needed to be recorded. He was clear with both of us that his intention was to accurately report his income.

Dr. Fife also wrote: "He admits that he did not keep written records of various transactions, and that he made various transactions in cash." As Mr. Cavallaro explained to me and to Dr. Fife, he kept the details of his loans to the company "in his head," but also kept notes in his check registers and on other pieces of paper, detailing his cash receipts. He thought his bookkeeping methods were adequate to fully inform his accountant.

In her conclusions, Dr. Fife was dismissive of the neuropsychological testing, Mr. Cavallaro's personality disorder and the abundance of behavioral data apparent in her own interview. She incompletely reported the findings from the neuropsychological testing, reducing the results to "high" scores in math, attention, and processing speed, "all in favor of someone with the requisite skills to accurately keep track of and report income." Dr. Fife ignored the data that underscore Mr. Cavallaro's difficulty with reading, managing complexity, and his tendency to act impulsively when faced with an anxiety-provoking task. Dr. Fife also dismissed the severity of Mr. Cavallaro's anxiety disorder, for example characterizing his excessive worry about his physical health as "simply reality based," without considering Mr. Cavallaro's statements to her about his fears regarding his chest pain and his conviction that he had cancer after losing a significant amount of weight.

With respect to Mr. Cavallaro's personality structure, Dr. Fife stated "I did not at all find evidence of avoidant personality disorder," although she observed that the psychological testing had indicated its presence. She characterized Avoidant Personality Disorder as related to "the avoidance of relationships or social situations, not with avoidance of reporting income." (DSM-IV-TR describes Avoidant Personality Disorder as "A pervasive pattern of social inhibition, feelings of inadequacy, and hypersensitivity to negative evaluation, beginning by early adulthood and present in a variety of contexts….")

In addition to dismissing the context in which Mr. Cavallaro's behavior occurred, Dr. Fife artificially narrowed the focus of the examination to an assessment of Mr. Cavallaro's depression and anxiety, as if these were the only factors relevant to his actions. In engaging in this oversimplification, Dr. Fife also ignored Mr. Cavallaro's behavior in her interview. For example, Mr. Cavallaro misunderstood one of Dr. Fife's

preliminary questions about why she was examining him, and launched into a confusing, naïve and rambling explanation of how he was beginning to understand why his assumptions about his accounting practices were incorrect. At another point, Mr. Cavallaro stumbled through a concrete explanation of what his various medications were for. At the end of the interview, Mr Cavallaro apologized to Dr. Fife for "put[ting] you through this." These were graphic examples of Mr. Cavallaro's concrete cognitive style and persistent confusion about intellectually complex matters. Yet Dr. Fife characterized Mr. Cavallaro as a knowing and manipulative man engaging in consciously deceitful practices.

For example, Dr. Fife stated, "I believe he was simply not reporting income." She added "He admits to using cash as a preferred method of payment to suppliers, for the purpose of receiving discounts, evidence that I believe supports a sophisticated understanding of the difficulty in tracking cash as income or payments." There was no discussion about the use of cash in Dr. Fife's interview of Mr. Cavallaro, yet she constructed a complex theory about his aim to hide his actions and deceive others. These elements of guile and manipulation were not only notably absent from any of the objective psychological testing data on Mr. Cavallaro, but also absent in his interview with Dr. Fife. As the transcript shows, Mr. Cavallaro was forthright with her, in his characteristically naïve fashion, even "telling me that he had thought of bringing me flowers…but was advised by his attorney not to do so."

Dr. Fife's analysis requires dismissal of the complex neuropsychological findings, the psychological testing, the abundance of behavioral data and Mr. Cavallaro's own consistent accounts of his thoughts and actions in her and my interviews. Dr. Fife does not grapple in any meaningful way with any of the data that contradict her unsupported assertions, and instead mischaracterizes Mr. Cavallaro as a willfully and knowingly deceptive man.

After reviewing the transcript of Dr. Fife's interview of Mr. Cavallaro and her written psychiatric evaluation of him, I still believe that Mr. Cavallaro's mental capacity was diminished during the offense conduct for the reasons explained in my previous report.

Sincerely yours,

*Julia M. Reade MD*

Julia M. Reade, M.D.